**IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISCTRICT OF ILLINOIS
EASTERN DISVISION**

| | |
|---|---|
| **QUIANA PEREZ,** | |
| **Plaintiff,** | |
| **v.** | **Case No.: 1:23-cv-1159** |
| **LUSTER PRODUCTS, INC., L'ORÉAL USA, INC., L'ORÉAL USA PRODUCTS, INC., SOFTSHEEN-CARSON LLC., SOFTSHEEN-CARSON (W.I.), INC., STRENGTH OF NATURE, LLC., GODREJ SON HOLDINGS, INC., and BEAUTY BELL ENTERPRISES, LLC., d/b/a HOUSE OF CHEATHAM, INC.,** | **JURY TRIAL DEMAND** |
| | *In re: Hair Relaxer Marketing, Sales Practices, and Product Liability Litigation* |
| | *Case Number: 23:CV-00818* |
| **Defendants.** | |

**COMPLAINT**

The Plaintiff, Quiana Perez, by and through her undersigned counsel, makes the following Complaint against Defendants Luster Products, Inc., L'Oréal USA, Inc., L'Oréal USA Products, Inc., SoftSheen-Carson LLC., SoftSheen-Carson (W.I.), Inc., Strength of Nature LLC., Godrej Son Holdings, Inc., and Beauty Bell Enterprises, LLC., d/b/a House of Cheatham, Inc., (collectively, "Defendants"), and alleges the following:

**NATURE OF THE ACTION**

1.     This action arises out of Ms. Perez's gynecologic injuries caused by Defendants. Specifically, Ms. Perez's uterine cancer and endometriosis were directly and proximately caused by her regular and prolonged exposure to phthalates and other endocrine disrupting chemicals found in Defendants' hair care Products.

2.     Plaintiff brings this action against Defendants for claims arising from the direct and proximate result of Defendants', their directors', agents', heirs' and assigns', and/or their corporate predecessors' negligent, willful, and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, distribution, labeling, regulation, and/or sale of the Products, including those known as Lusters,  African Pride, Africa's Best,  Optimum Care,  Soft & Beautiful, Just for Me, and Dark & Lovely.

## I.     PARTIES

3.     Plaintiff Quiana Perez is, and at all times relevant to this action was, a citizen and resident of the state of New Jersey,  with her place of residence being Camden County, New Jersey.

4.     Defendant Luster Products, Inc. is, and at all times relevant to this action was, a corporation with its principal place of business at 1104 West 43rd Street, Chicago, IL 60609. Process may be served upon its registered agent Kimberley A. Palmisano at 3201 Old Glenview Road, STE 325, Wilmette, IL 60091.

5.     Defendant L'Oréal USA, Inc. is, and at all times relevant to this action was, a corporation with its principal place of business and headquarters located at 575 Fifth Avenue, New York, New York 10017. Process may be served upon its registered agent, Corporation Service Company, 80 State Street, Albany, NY 12207.

6.      Defendant L'Oréal USA Products, Inc. is, and at all times relevant to this action was, a corporation with its principal place of business and headquarters located at 10 Hudson Yards, 347 10th Avenue, New York, New York 10001. Process may be served upon its registered agent, Corporation Service Company, 80 State Street, Albany, NY 12207, or upon its Illinois agent Illinois Corporation Service Company, 801 Adlai Stevenson Drive, Springfield, IL 62703.

2

7.      Defendant SoftSheen-Carson LLC. is, and at all times relevant to this action was, a corporation with its principal place of business and headquarters located in Savannah, Georgia. Upon information and belief, Defendant SoftSheen-Carson LLC is presently headquartered at 10 Hudson Yards, 347 10th Avenue, New York, New York 10001. Process may be served upon its registered agent, Corporation Service Company, 80 State Street, Albany, NY 12207.

8.      Defendant SoftSheen-Carson LLC. is, and at all times relevant to this action has been, a wholly owned subsidiary of Defendant L'Oréal USA, under the complete dominion and control of Defendant L'Oréal.

9.      Defendant SoftSheen-Carson (W.I.), Inc. is, and at all times relevant to this action was, a corporation. Process may be served upon its registered agent, Corporate Service Company 251 Little Falls Drive, Wilmington, Delaware 19808.

10.     Defendant SoftSheen-Carson (W.I.), Inc. is, and at all times relevant to this action has been, a wholly owned subsidiary of Defendant L'Oréal USA, under the complete dominion of and control of Defendant L'Oréal.

11.     Defendants L'Oréal USA, Inc., L'Oréal USA Products, Inc., SoftSheen-Carson LLC., and SoftSheen-Carson (W.I.), Inc. are collectively referred to herein as the "L'Oréal Defendants."

12.     Defendant Strength of Nature, LLC. is, and at all times relevant to this action was, a corporation with its principal place of business and headquarters located at 64 Ross Road, Savannah, Georgia 31405. Process may be served upon its registered agent, Karen Sood at 64 Ross Road, Savannah, Georgia 31405

13.     Defendant Godrej Son Holdings, Inc. is, and at all times relevant to this action was, a corporation with its principal place of business and corporate headquarters located at 64 Ross

Road, Savannah, Georgia 31405. Process may be served upon its registered agent Karan Sood at 64 Ross Road, Savannah, Georgia 31405

14.     Defendants Strength of Nature, LLC. and Godrej Son Holdings, Inc. are collectively referred to herein as the "Godrej Defendants."

15.     Defendant Beauty Bell Enterprises, LLC., d/b/a House of Cheatham, Inc. is, and at all times relevant to this action was, a corporation with its principal place of business and corporate headquarters located at 1445 Rock Mountain Boulevard, Stone Mountain, Georgia 30883. Process may be served upon its registered agent Scroggins & Burns, LLC., 47 Mimosa Blvd., Roswell, Georgia 30075.

16.     Upon information and belief, at all relevant times, all Defendants regularly transacted, solicited, and conducted business in all fifty states of the United States, with full knowledge that their Hair Straighteners and Relaxers were being placed into interstate commerce and being sold in Illinois.

17.     At all times material hereto, Defendants developed, tested, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, supplied, and/or sold hair straightener and relaxer products, hereinafter referred to as the "Products," including but not limited to:

> a.  Lusters Pink
>
> b.  Lusters Smooth Touch
>
> c.  African Pride
>
> d.  Africa's Best
>
> e.  Motions;
>
> f.  Dark & Lovely;

g.  Just for Me

h.  Optimum Care;

i.  Care Free;

j.  Frizz Free;

k.  Alternatives; and

l.  Soft & Beautiful.

18.     Defendants' defective hair Products were placed into the stream of interstate commerce and were used by the Plaintiff in or around 1990 through approximately 2022.

19.     Plaintiff Quiana Perez used the Products continually throughout her life every eight to twelve weeks both in beauty salons and personally.

20.     On or about November 6, 2019, Ms. Perez was diagnosed with endometrial adenocarcinoma (uterine cancer), a diagnosis caused by Plaintiff's exposure to chemicals in the Defendants' aforementioned hair relaxer Products.

## II.     JURISDICTION AND VENUE

21.     This Court has subject-matter jurisdiction over this case under 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 and Plaintiff and Defendants are residents of different states.

22.     This Court has jurisdiction over the Luster Products Inc. Defendant. Defendant have their principal place of business and corporate headquarters in Cook County, Illinois, are registered to do business in Illinois, have a registered agent in Illinois and have regularly and systematically transacted business within the State of Illinois. Defendants have committed tortious acts both inside and outside the State of Illinois while regularly doing business in Illinois and engaging in a persistent course of conduct, and/or deriving substantial revenue from goods used

and/or consumed and/or services rendered in Illinois. Defendants' acts advertising, manufacturing, supplying, packaging, formulating, distributing, shipping, testing, and otherwise selling the Products used by Plaintiff.

23.     This Court has personal jurisdiction over the L'Oréal Defendants. Defendants regularly and systematically transacted business within the State of Illinois, have committed tortious acts both inside and outside the State of Illinois while regularly doing business in Illinois and engaging in a persistent course of conduct, and/or deriving substantial revenue from goods used and/or consumed and/or services rendered in Illinois. Defendants are registered to do business in the State of Illinois and have a registered agent in the State of Illinois. Defendant SoftSheen in particular was founded in Chicago, Illinois in 1964 and operated out of Chicago for decades of Plaintiff's use, until at least 1998 when it was acquired by L'Oréal.  Defendants' acts included advertising, manufacturing, supplying, packaging, formulating, distributing, shipping, testing, and otherwise selling the Products used by Plaintiff.

24.     This Court has personal jurisdiction over the Godrej Defendants. Defendants regularly and systematically transact business within the State of Illinois, have committed tortious acts and omissions both inside and outside the State of Illinois while regularly doing business in Illinois and engaging in a persistent course of conduct, and/or deriving substantial revenue from goods used and/or consumed and/or services rendered in Illinois. These acts included advertising, manufacturing, formulating, packaging, supplying, distributing, shipping, testing, and otherwise selling the Products used by Plaintiff.

25.     This Court has personal jurisdiction over the Beauty Bell Enterprises, LLC., d/b/a House of Cheatham Inc, Defendant. Defendant regularly and systematically transact business within the State of Illinois, have committed tortious acts and omissions both inside and outside the

State of Illinois while regularly doing business in Illinois and engaging in a persistent course of conduct, and/or deriving substantial revenue from goods used and/or consumed and/or services rendered in Illinois. These acts included advertising, manufacturing, formulating, packaging, supplying, distributing, shipping, testing, and otherwise selling the Products used by Plaintiff.

26.     Venue is proper in this District under 28 U.S.C. § 1391, because a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this District and one or more Defendants reside in this District.

27.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(a) and (b)(2) and 1391(c)(2) because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district, and the Defendants are subject to this Court's personal jurisdiction. Venue is also proper under 18 U.S.C § 1965 (a) because Defendants transact substantial business in this district.

## III.     FACTUAL ALLEGATIONS

### A. Hair Straighteners and Relaxers

#### a. Market for Hair Straightening and Relaxing Products

28.     Black people make up about 13 percent of the U.S. population, but by one estimate, African American spending accounts for as much as 22 percent of the $42 billion-a-year personal care products market, suggesting that they buy and use more of such products – including those with potentially harmful ingredients – than Americans as a whole.[1]

---

[1] Thandisizwe Chimurenga, *How Toxic is Black Hair Care?,* New America Media, Feb. 2, 2012, www.americamedia.org/2012/02/skin-deep-in-more-ways-than-one.php; *Personal Care Products Manufacturing Industry Profile,* Dun & Bradstreet First Research, August 2016, www.firetresearch.com/Industry-Research/Personal-Care-Products-Manufacturing.html (this report uses "Black" to describe not only people who identify as African-American, but Black people in the U.S. who come from the Caribbean or other areas. "African-American" is used only when a cited source specifies that term).

7

29.     In an analysis of ingredients in 1,177 beauty and personal care products marketed to Black women, about one in twelve was ranked highly hazardous on the scoring system of EWG's Skin Deep® Cosmetics Database, a free online resource for finding less-hazardous alternatives to personal care products. Maintained by the Environmental Working Group, this database provides information on the safety and potential harms of ingredients in a wide range of skincare products, cosmetics, and other personal care and beauty products. The database provides information on cancer risk, reproductive toxicities, and allergies.[2] The worst scoring products marketed for Black women were hair relaxers, hair colors and bleaching products. Each of these categories had an average product score indicating a high potential hazard.

30.     In the U.S. alone, Black consumers spend over $1 trillion each year on consumer goods, with an outsized spending on hair care products compared to other ethnicities.

31.     In 2020, the global Black hair care market was estimated at $2.5 billion, with the hair relaxer market alone estimated at $718 million in 2021, with the expectation of growth to reach or exceed $854 million annually by 2028.

**b.  History of Hair Relaxers in America**

32.     In its natural or virgin state, afro-hair texture is characterized by coiled, springing, zigzag, and s-curve curl patterns; as well as by its density, fullness, texture, and feel. [3]

33.     Afro-texture hair "naturally grows up and out."[4]

---

[2]  https://www.Ewg.org/skindeep/learn_more/about/
[3]  Patrick Obukowcho, *Hair Relaxers: Science, Design, and Application,* 26, 14 (2018).
[4]  Ayana Byrd & Lori Tharps, *When Black Hair Is Against the Rules,* The New York Times, April 30, 2014,
https://www.nytimes.com/2014/05/01/opinion/when-black-hair-is-against-the-rules.html

34.     African hairstyles were status symbols reflecting one's "marital status, age, religion, and rank in society" and tribe.[5] Warriors, kings, and queens wore braids to show their ranking in society.[6] The Wolof tribe in West Africa wore braided styles when they went to war.[7]

35.     Most styling was extremely intricate and involved days of labor. "Only the mad and mourning did not do their hair."[8]

36.     "Hair that was once a source of pride and expression of identity was often tucked away beneath cloth to cover rough, tangled tresses and shield them from hours spent toiling under the sun."[9] The hair that was once an important spiritual and cultural symbol became tangled and matted.

37.     In 1786, Governor Don Esteban Miro of Louisiana passed the "Tignon Law" requiring Black women to wear a tignon (scarf) over their hair as a way of signifying they were members of the slave class, *even if they were free.* [10]

38.      "By requiring free Black women to wear the same hair covering, the governor was marking them as related to enslaved women rather than white women."[11]

39.     This law sent a direct signal to Black people that their hair held a symbol of inequality and was a sign of poverty regardless of their actual social status.

---

[5] *History of Braids: More Than Just a Hairstyle,* Genesis Career College, https://www.genesiscareer.edu/history-of-braids-more-than-just-a-hairstyle/
[6]  *Id.*
[7]  *Id.*
[8]  Hlonipha, Mokoena, *From Slavery to Colonialism and School Rules, Navigating the History of Myths about Black Hair,* Quartz Africa, Fe., 24, 2018, https://qz.com/africa/1215070/black-hair-myths-from-slavery-to-colonialism-school-rules-and-good-hair/
[9]  *Id.*
[10]  Nicki Fox, *6 Things Everyone Should Know About Black Hair History,* Odele, Feb. 22, 2021. https://www.odelebeauty.com/blogs/the-rings/black-hair-history-facts
[11]  *Fashionable Rebellion,* Women and the American Story, New York Historical Society Museum and Library, https://www.wams.nyhistory.org/settler-colonialism-and-revolution/settler-colonialism/fashionable-rebellion/

40. Because afro-textured hair was kinky and reflected African heritage rather than European ancestry, afro-textured hair was stigmatized as low social status. [12]

41. Slaves with lighter skin and less coarse hair were favored to work in the home, a far less strenuous position than in the plantation fields. [13]

42. Texturism, the idea that "good hair" is equated with a straighter hair texture, was cemented into American culture during its period of chattel slavery. Thus, "the texture of an enslaved person's hair could determine their value and working conditions, which in turn might impact their overall health, comfort and chances for freedom[.][14] Naturally, Black women strived for a better life in America and were taught that the straighter and less kinky their hair was, the better life they could have.[15] This fueled the desire for tools and products that could straighten Black hair texture.

43. Gone were the days of African pride in African hairstyles. "The goal of grooming the hair had morphed from the elaborate and symbolic designs of Africa into an imitation of White styles adapted to Black kinks and curls."[16]

44. In an effort to obtain a better life, many slaves would go to "dangerous lengths to straighten their hair."[17]

_____

[12] Brenda A. Randle, *I Am Not My Hair,* Race, Gender and Class, Volume 22, Number 1-2, 114-121 (2015).
[13] *Id.*
[14] *Id.*
[15] Chanel Donaldson, *Hair Alteration Practices Amongst Black Women and the Assumption of Self-Hatred,* Applied Psychology Opus, https://www.wp.nyu.edu/steinhardt-appsych_opus/hair-alteration-practices-amongst-black-women-and-the-assumption-of-self-hatred/
[16] Brenda A. Randle, *I Am Not My Hair,* Race, Gender and Class, Volume 22, Number 1-2, 114-121 (2015).
[17] Nicki Fox, *6 Things Everyone Should Know About Black Hair History,* Odele, Feb. 22, 2021. https://www.odelebeauty.com/blogs/the-rings/black-hair-history-facts

45.     Black or afro-textured hair can be manipulated into a straightened state with the use of hair tools and hair products. Prior to the invention of the chemical relaxer in the 1900s, individuals would "press" afro-textured hair with metal hair tools such as the "hot comb." Pressing combs or hot combs are metal hair tools that are first heated on a stove or in a ceramic heater, then pressed into hair strands to temporarily straighten them.[18]

46.     The hot comb was first invented by Frenchman Marcel Grateau who popularized the hair styling tool in Europe in the 1870s in part by advertising in catalogs of major department stores like Sears and Bloomingdales.[19] The hot comb was later modified by Madam C.J. Walker, a trailblazer in the development of Black hair products, to be manufactured with wider comb teeth.[20] With Walker's system, once the comb was heated, a softening ointment was then applied for easier manipulation of Black hair.[21]

47.     Today, afro-textured hair is still often straightened with alternative heat mechanisms rather than with chemicals. However, pressed hair remains susceptible to "shrinkage." Shrinkage is the process by which curly, kinky hair that has been temporarily straightened coils back into its natural state once the hair interacts with water, humidity, or perspiration,[22] creating a shorter or fuller appearance.

---

[18]  Jaclyn Peterson, *The Price of Beauty,* CTI Charlotte Teachers Institute Curriculum (2021).
[19]  Henry Louis Gates, *Madam Walker, the First Black American Woman to Be a Self-Made Millionaire,* PBS 100 Amazing Facts About the Negro, https://www.pbs.org/wnet/african-americans-many-rivers-to-cross/history/100-amazing-facts/madam-walker-the-first-black-american-woman-to-be-a-self-made-millionaire
[20]  Cookie Lommel, Madam C.J. Walker 60 (1993)
[21]  *Id.* at 62.
[22]  *Id.*



48.     African American inventor Garrett Augustus Morgan discovered and created a system that would permanently straighten afro-textured hair and eliminate the issue of "shrinkage."

49.     In addition to being an inventor, Morgan was also a tailor. In the early 1900s, Morgan was repairing his sewing machines and wanted to find a way to polish the needles to stich fabrics more smoothly.[23] He applied a chemical solution to the needles and wiped the solution off with a rag. Morgan soon noticed that the "curly" fibers in the rag were straightened after exposure to the chemical. [24]

50.     Morgan further tested the chemical on a dog with curly hair and eventually on his own hair. The chemical solution successfully straightened curly hair. He turned his formula into a gel-hair product, creating the G.A. Morgan Hair Refining Cream which was marketed in 1913.

---

[23] Patrick Obukowcho, *Hair Relaxers: Science, Design, and Application,* 27 (2018).
[24] Mary N. Oluonye, Garrett Augustus Morgan: Businessman, Inventor, Good Citizen, 28 (2008).





51.     Morgan's invention paved the way for the alkaline relaxer and later development of additional chemical-based permanent hair straightening products in the Black hair care market.[25]

---

[25] Patrick Obukowcho, *Hair Relaxers: Science, Design, and Application,* 27 (2018).

### c. Defendants' Marketing Efforts

52.     In 1971, Carson, since acquired by L'Oreal and merged with SoftSheen, manufactured the first lye relaxer. The formula consisted of sodium hydroxide, water, petroleum jelly, mineral oils, and emulsifiers.[26]

53.     In the 1970s, lye relaxer users and manufacturers noticed that the lye formula stripped proteins from the hair strand, resulting in the hair thinning and breaking.[27] As a result, Johnson & Johnson marked the first "gentle" hair relaxer in 1981, which used milder chemicals such as potassium hydroxide and lithium hydroxide.[28]

54.     Over time, Soft & Beautiful and other chemical relaxer manufacturers developed herbal and botanical hair relaxer formulas. [29]

55.     In 1978 Mario De La Guardia, while at Carson, helped invent a breakthrough product called Dark & Lovely which contained no lye and quickly became an industry leader as the process was less damaging to women's hair and scalp. [30]

56.     In 2000 Carson Products was sold to L'Oreal and De La Guardia and his family started Strength of Nature LLC. which eventually teamed up with the Godrej Defendants in 2016 and continues selling its various hair relaxer products to this day. [31]

---

[26]  Cicely A. Richard, *This History of Hair Relaxers,* September 29, 2017, https://www.classrooms.synonym.com/the-history-of-hair -relaxers-12078983.html
[27]  *Id.*
[28]  *Id.*
[29]  *Id.*
[30]  https://www.savannahnow.com/story/news/2016/09/15/cuban-american-businessman-extends-his-fathers-legacy/13976894007/
[31]  *Id.*

57.     Today, Defendants market their hair relaxer products to Black customers across the United States, and the world, reinforcing the same historical Eurocentric standards of beauty. Defendants' marketing schemes rely heavily on branding and slogans that reinforce straight hair as the preferred standard. [32]

58.     The Defendants have depicted or implied all of their Product used by Plaintiff are based off natural products and otherwise health or safe to use.

59.     Defendant Lusters Products, Inc. depicts a Black woman with strait hair on both its Smooth Touch and Pink brand of hair relaxer products, with specific language pointing out that is "no-lye" and has olive oil implying that the product is safe to use.





60.     Defendant Godrej Motions depicts a Black woman with strait hair on its Motions brand of relaxer product.

---

[32] Cicely A. Richard, *This History of Hair Relaxers,* September 29, 2017, https://www.classrooms.synonym.com/the-history-of-hair -relaxers-12078983.html

15



61.     Defendant Godrej depicts a young Black girl with strait hair on its Just for Me brand of hair relaxer product, again calling out the natural and safe ingredients.



62.     Defendant Godrej depicts a Black woman with strait hair on its Soft & Beautiful brand of hair relaxer specifically describing the "Triple Hydration Oils" used as olive, argan and coconut implying it is a natural and safe product.

16



63.     Defendant L'Oreal depicts a Black woman with strait hair on its Dark & Lovely brand of relaxer product.



### d.   Chemical Relaxer Use

64.   Hair relaxers are classified as creams or lotions which are specifically marketed to Black and Brown women to "tame their ethnic hair by making it smoother, straighter, and easier to manage on a daily basis."

65.   Hair relaxing, or lanthionization, can be performed by a professional cosmetologist in a salon or barbershop, or at home with at-home relaxer kits designed for individual use. These home kits are sold in grocery, drug, beauty, and other retail supply stores in urban and rural cities throughout the United States.

66.   Relaxers are applied to the base of the hair shaft and left in place for a "cooking" interval, during which the relaxer alters the hair's texture by purposefully damaging the hair's natural protein structure. The effect of this protein damage straightens and smooths the hair. After a period of weeks (4-8 weeks on average), depending on the hair's natural growth rate, the treated portion of the hair grows away from the scalp as new growth sprouts from the roots, requiring additional relaxer treatment to smooth the roots. These additional treatments are colloquially referred to in the community as "re-touches," resulting in women relaxing their new growth every four to eight weeks on average, typically for decades.

67.   Hair relaxers can, and often do, cause burns and lesions on the scalp, facilitating introduction of hair relaxer chemicals into the body. The main ingredient of "lye" relaxers is sodium hydroxide; no-lye relaxers contain calcium hydroxide and guanidine carbonate, and "thio" relaxers contain thioglycolic acid salts. No-lye relaxers are advertised to cause fewer scalp lesions and burns than lye relaxers, but there is little evidence to support this claim.

68.   Some studies show that up to 90% of Black and Brown women have used hair relaxants and straighteners. Hair relaxers contain hormonally active and carcinogenic compounds,

18

such as phthalates, known to cause endocrine disruption, which are not required to be listed separately as ingredients and are often broadly lumped into the "fragrance" or "perfume" categories of ingredients. Relaxer habits usually begin in the formative childhood years, and adolescence is a period of enhanced susceptibility to debilitating conditions resulting from exposure to these chemicals. [33]

69.    In the 1990s, the first relaxer product for young Black girls, Just for Me ™, hit the market with a catchy advertising jingle that captured consumer attention. [34] It soon became one of the most popular straightening treatments, touting a no-lye formula designed to be gentler for children's sensitive scalps.

70.    Once relaxer use begins in childhood, it usually becomes a lifetime habit. The frequency of scalp burns with relaxer application can increase the risk of permanent and debilitating diseases associated with long-term exposure to endocrine-disrupting chemicals.

71.    The reasons for Black women's use and dependence upon hair straightening products are associated with a range of factors, including (1) slavery and internalization of acceptable beauty norms, (2) media and advertisements, (3) assimilation and economic security, (4) ease of hair maintenance, and (5) culture. [35]

72.    In a culture where Black women are often reduced to a lower standard of beauty, these factors impact women of color's decisions to begin and continue using products to alter the natural state of their hair, many times as a protective mechanism against racial discrimination. In

---

[33] Patrick Obukowcho, Hair Relaxers: Science, Design, and Application 27 (2018)

[34] Dana Oliver, *The 90s Just For Me Hair Relaxer Commercial Song Is Stuck In Our Heads,* HuffPost, Feb. 1, 2014. https://www.huffpost.com/entry/just-for-me-hair-relaxer-commercial-song_n_4689981

[35] Chanel Donaldson, *Hair Alteration Practices Amongst Black Women and the Assumption of Self-Hatred,* Applied Psychology Opus, https://www.wp.nyu.edu/steinhardt-appsych_opus/hair-alteration-practices-amongst-black-women-and-the-assumption-of-self-hatred/

the Dove CROWN Study for girls (2021) conducted by JOY Collective, the following statistics were discovered[36]:

    a.   100% of Black elementary school girls in majority-white schools who report experiencing hair discrimination state they experienced the discrimination by the age of (10)

    b.   86% of Black teens who experience discrimination state that they have experienced discrimination based on their hair by the age of twelve (12).

    c.   66% of Black girls in majority-white schools report experiencing hair discrimination compared to 45% of Black girls in all school environments.

    d.   53% of Black mothers, whose daughters have experienced hair discrimination, say their daughters experienced the discrimination as early as five (5) years old.

    e.   47% of Black mothers report having experienced discrimination related to their hair.

    f.   Trauma from these experiences cause girls to miss days from school; teenage Black girls are missing a week of school per year due to hair dissatisfaction.

    g.   While 90% of Black girls believe their hair is beautiful, the microaggressions and discrimination she endures has an impact on how she sees herself.

    h.   Black women are 1.5 times more likely to be sent home from the workplace because of their hair.

---

[36] The CROWN Act was created in 2019 by Dove and the CROWN Coalition, in partnership with then State Senator Holly J. Mitchell of California, to ensure protection against discrimination based on race-based hairstyles by extending statutory protection to hair texture and protective styles such as braids, locks, twists, and knots in the workplace and public schools. https://www.thecrownact.com

i.   Black women are 89% more likely than white women to agree with this statement, "I have to change my hair from its natural state to fit in at the office."

73.   The CROWN Act of 2021 is a legislative bill introduced in both houses of Congress to address discrimination against protective hair styles worn predominantly by women of color. While the bill has not yet passed fully on a federal level, eighteen states have signed a version of the bill into state law. Unless and until the CROWN Act makes hair discrimination illegal in every state, teenagers and women of color continue to face discriminatory practices related to their hair choices, with relaxing and straightening their hair being a defensive, yet dangerous and toxic option. Illinois officially adopted the CROWN Act in June of 2022 when Governor Pritzker signed the act into law codifying protections for Illinoisians discriminated against due to hairstyles historically associated with specific racial groups. The law went into effect January 1rst, 2023. [37]

### e.   Regulatory Framework

74.   The law does not require cosmetic products and ingredients, other than color additives, to have FDA approval before they go to market. But there are laws and regulations that apply to cosmetics. The two most important laws pertaining to cosmetics marketed in the United States are the Federal Food Drug and Cosmetic Act (FD&C Act") and the Fair Packaging and Labeling Act ("FPLA").

75.   The FD&C Act expressly prohibits the marketing of "adulterated" or "misbranded" cosmetics in interstate commerce.

---

[37] Illinois e-News Release, Wednesday, June 29, 2022 – Governor Pritzker Signs Crown Act Into Law Protecting Against Hair Discrimination. https://dhr.illinois.gov/content/dam/soi/en/web/dhr/site-assets/pages/default/crown-act-illinois-e-news-release.pdf

76.     Adulteration refers to a violation involving product composition whether it results from ingredients, contaminants, processing, packaging, shipping, or handling.

77.     Under the FD&C Act a cosmetic is adulterated if: 1) it bears or contains any poisonous or deleterious substance causing injury to the product user, and 2) if its container is composed in whole or in part, of any poisonous or deleterious substance which may render the contents injurious to health.

78.     Misbranding refers to violations involving improperly labeled or deceptively packaged products.

79.     Under the FD&C Act, a cosmetic is misbranded if 1) labeling is false or misleading; 2) the label does not include all required information; 3) required information is not prominent and conspicuous; or 4) the packaging and labeling is in violation of an applicable regulation issued pursuant to Sections 3 and 4 of the Poison Prevention Packaging Act of 1970.[38]

80.     Under U.S. law, cosmetic manufacturers are not required to submit their safety data to the FDA. However, it is against the law to put an ingredient in a cosmetic that makes the cosmetic harmful when used as intended.[39] An example is methylene chloride because it causes cancer in animals and is likely to be harmful to human health too.[40]

81.     On May 19, 2022, the FDA issued a rule to amend its food additive regulations to no longer provide for most previously authorized phthalates to be used as food additives, and these uses have purportedly been abandoned by industry.[41] The FDA revoked authorizations for food

---

[38] Food and Drug Administration Cosmetic Act § 602 (1938)
[39] *Prohibited & Restricted Ingredients in Cosmetics,* U.S. Food and Drug Administration, https://www.fda.gov/cosmetics/cosmetics-law-regulations/prohibited-restricted-ingredients-cosmetics
[40] 21 Code of Federal Regulations § 700.19
[41] § 87FR 31080

contact use of 23 phthalates and two other substances used as plasticizers, adhesives, defoaming agents, lubricants, resins, and slimicides. [42]

82.     Companies and/or individuals who manufacture or market cosmetics have a legal responsibility and duty to ensure the safety of their own products. Neither the law nor FDA regulations require specific tests to demonstrate the safety of individual products or ingredients, and the law also does not require cosmetic companies to share their safety information with the FDA.

83.     The FDA has consistently advised manufacturers to use whatever testing is necessary to ensure the safety of products and ingredients, which may be substantiated through (a) reliance on already available toxicological test data on individual ingredients and on product formulations that are similar in composition to the particular cosmetic, and (b) performance of any additional toxicological and other tests that are appropriate in light of such existing data and information. [43]

84.     Except for color additives and ingredients prohibited or restricted by regulation, a manufacturer may use any ingredient in the formulation of a cosmetic, provided that (1) the ingredient and the finished cosmetic are safe under labeled or customary conditions of use, (2) the product is properly labeled, and (3) the use of the ingredient does not otherwise cause the cosmetic to be adulterated or misbranded under the laws the FDA enforces. [44]

---

[42] *Phthalates in Food Packages and Food Contact Applications,* U.S. Food and Drug administration, https://www.fda.gov/food/food-ingredients-packaging/phthalates-food-packaging-and-food-contact-applications

[43] *FDA Authority Over Cosmetics: How Cosmetics Are Not FDA-Approved, but are FDA-Regulated,* U.S. Food and Drug Administration, Mar. 3, 2005, https://www.fda.gov/cosmetics/cosmetics-laws-regulations/fda-authority-over-cosmetics-how-cosmetics-are-not-fda-approved-are-fda-regulated

[44] *Id.*

85.     With respect to whether the product is properly labeled, Title 21 of the Code of Federal Regulations defines the manufacturer's duty to warn consumers of potential health hazards. Section 740.1 states that "[t]he label of a cosmetic product ***shall*** bear a warning statement whenever necessary or appropriate to prevent a health hazard that ***may*** be associated with the product." (Emphasis added). This warning mandate directly correlates with the broad authority of manufacturers over their own cosmetic products to ensure that products are safe under labeled or customary conditions of use, properly labeled, and not adulterated or misbranded under FDA laws.

86.     In short, under the current regulatory framework in the United States, it is incumbent upon the manufacturers of cosmetic products, and them alone, to assess the safety and efficacy of their products, and to warn consumers any time a health hazard may be associated with their products. Here, a wealth of scientific information is available regarding long-term use of hair relaxers, straighteners and hair dyes as containing certain endocrine-disrupting chemicals, which should have alerted manufacturers of these products to the specific and dangerous harms associated with their products when used as intended, particularly in women of color. Defendants' Products contain no such warnings.

f.      **Endocrine-Disrupting Chemicals**

87.     The endocrine system is vital for life and influences nearly every cell, organ, and process in the body.[45]  The endocrine system helps regulate all biological processes in the body from conception through adulthood, including the development of the brain and nervous system,

---

[45]  *Endocrine System: The Endocrine System Includes the Thyroid, Adrenals, and the Pituitary Gland,* Science Direct, https://www.sciencedirect.com/topics/psychology/endocrine-system

24

the growth and function of the reproductive system, as well as metabolism and blood sugar maintenance.[46]

88.     The endocrine system is a tightly regulated system made up of glands that produce and release precise amounts of hormones that bind to receptors located on specific target cells throughout the body. [47]

89.     Hormones, such as estrogen, testosterone, progesterone, and androgen, control or regulate critical biological processes.[48]

90.     When a hormone binds to a target cell's receptor, the receptor carries out the hormone's instructions, the stimulus, and either switches on or switches off specific biological processes in cells, tissues, and organs. [49]

91.     The precise functioning of the endocrine system is vital to maintain hormonal homeostasis within the body. A slight variation in hormone levels can lead to significant adverse-health effects, including reproductive impairment and infertility, cancer, cognitive deficits, immune disorders, and metabolic syndrome. [50]

92.     Endocrine disrupting chemicals ("EDCs") are chemicals, or chemical mixtures, which interfere with the normal activity of the endocrine system.

---

[46] *Endocrine Disruption,* United States Environmental Protection Agency, Mar. 7, 2022, https://www.epa.gov/endocrine-disruption/what-endocrine-disruption
[47] *Id.*
[48] *Id.*
[49] *Id.*
[50] *Id.;* Michele La Merrill, et al., *Consensus on the Key Characteristics of Endocrine-Disrupting Chemicals as a Basis for Hazard Identification,* Nature Reviews Endocrinol, Nov. 12,2019, https://www.nature.com/aricles/s41574-019-0273-8

93.     EDCs can act directly on hormone receptors as mimics or antagonists, or on proteins that control hormone delivery. [51]

94.     EDCs disrupt the endocrine system and interfere with the body's hormonal regulation and homeostasis in several ways.

95.     EDCs can cause the body to operate as if there were a proliferation of a hormone and thus over-respond to the stimulus or respond when it was not supposed to by mimicking a natural hormone.

96.     EDCs can increase or decrease the levels of the body's hormones by affecting the production, degradation, and storage of hormones.

97.     EDCs can block the hormone's stimulus through inducing epigenetic changes, modifications to DNA that regulate whether genes are turned on or off or altering the structure of target cells' receptors. [52]

98.     EDCs are known to cause numerous adverse human health outcomes including endometriosis, impaired sperm quality, abnormalities in reproductive organs, various cancers, altered nervous system and immune function, respiratory problems, metabolic issues, diabetes, obesity, cardiovascular problems, growth, and neurological and learning disabilities.[53]

99.     EDCs that mimic the effects of estrogen in the body may contribute to disease risk because exposure to estrogen, both endogenously and exogenously, is associated with uterine and

---

[51] Evanthia Diamanti-Kandarakis, et al., *Endocrine-Disrupting Chemicals: An Endocrine Society Scientific Statement,* Endocrine Reviews, June 30, 2009, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2726844

[52] Luis Daniel Martinez-Razo, et al., *The impact of Di-(2-ethylhexyl) Phthalate and Mono(2-ethylhexyl) Phthalate in placental development, function, and pathophysiology,* Environment International, January 2021, https://www.sciencedirect.com/science/article/pii/S0160412020321838?via%3Dihub

[53] *Endocrine Disrupting Chemicals (EDCs),* Endocrine Society, Jan. 24, 2022, https://www.endocrine.org/patient-engagement/endocrine-library/edcs

ovarian cancers, and a woman's lifetime risk of developing the diseases increases with greater duration and cumulative exposure.

100.    Natural and synthetic EDCs are present in hair products under the guise of "fragrance" and "perfumes," and thus enter the body when these products are applied to the hair and scalp. Studies exploring this issue have thus far classified EDCs as estrogens, phthalates, and parabens.

101.    Indeed, numerous studies spanning more than two decades have demonstrated the adverse impact EDCs including Di-2ethyhexylphthalate have on the male and female reproductive system, such as inducing endometriosis, abnormal reproductive trace formation, decreased sperm counts and viability, pregnancy loss, and abnormal puberty onset.[54]

### g. Phthalates

102.    Phthalates are used in a variety of cosmetics and personal care products. Phthalates are chemical compounds developed in the last century that are used to make plastics more durable. These colorless, odorless, oily liquids are also referred to as "plasticizers" based on their most common uses.

103.    Phthalates also function as solvents and stabilizers in perfumes and other fragrance preparations. Cosmetics that may contain phthalates include nail polishes, hair sprays, aftershave lotions, cleansers, and shampoos.

104.    Upon information and belief, at all relevant times herein, phthalates were used in Defendants' Products.

---

[54]    Hee-Su Kim, et al., *Hershberger Assays for Di-2-ethylhexyl Phthalate and Its Substitute Candidates,* Dev Reproduction, Mar. 22, 2018, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5915764/

105.    Phthalates are chemicals used to improve the stability and retention of fragrances and to help topical products stick to and penetrate the skin and hair.[55]

106.    Phthalates are known EDCs which interfere with natural hormone production, regulation, and degradation, and are detrimental to human health.[56]

107.    Phthalates are commonly used by cosmetics and hair care product manufacturers to make fragrances and colors last longer, and to make hair more flexible after a product is applied, among other uses.

108.    Phthalates can be found in most products that have contact with plastics during production, packaging, or delivery. Despite short half-lives in tissues, chronic exposure to phthalates adversely influences the endocrine system and functioning of multiple organs, have negative long-term impacts on the success of pregnancy, child growth and development, and reproductive systems in both young children and adolescents. Several countries have imposed restrictions and regulations on some types of phthalates.[57]

109.    Phthalates have been shown to disrupt the endocrine system.[58]

---

[55]  Olivia Koski & Sheila Hu, Fighting Phthalates, National Resources Defense Council, April 20, 2022, https://www.nrdc.org/stories/fighting-phthalates
[56]  Yufei Wang & Haifeng Qian, *Phthalates and Their Impacts on Human Health,* Healthcare (Basel) 9, 603, May 9, 2021, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8157593
[57]  *Id.*
[58]  *Id.*

110.     Defendants' Products referenced herein contain phthalates, including Di-2-ethylhexylphthalate. Di-2-ethylhexylphthalate[59] ("DEHP") is a highly toxic manufactured chemical[60] that does not occur naturally in the environment. [61]

111.     DEHP is a phthalate. [62]

112.     Under the authority of the Fair Packaging and Labeling Act ("FPLA"), the FDA requires an ingredient declaration on cosmetic products sold at the retail level to consumers.

113.     However, the regulations do not require the listing of the individual fragrance or flavor ingredients, meaning phthalates evade listing when combined with a fragrance. As a result, consumers, including Plaintiff, are not able to determine from the ingredient declaration on the label if phthalates were present in a fragrance used in the herein-referenced hair Products placed into the stream of commerce by Defendants and used by the Plaintiff.

114.     Since 1999, the Centers for Disease Control and Prevention ("CDC") has found phthalates in individuals studied for chemical exposure. [63] The National Toxicology Program (NTP) evaluated DEHP in the Fifteenth Report on Carcinogens and found it reasonably anticipated to be a human carcinogen based on sufficient evidence of carcinogenicity from studies in

---

[59]  Also known as Bis(2-ethylhexyl) phthalate

[60]  Sai Rowdhwal & Jiaxing Chen, *Toxic Effects of DI-2-ethylhexyl Phthalate: An Overview,* Biomed Research International, Feb. 22, 2018, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5842715/#:~:text=DEHP%20is%20noncovalently%20bound%20to,and%20plastic%20waste%20disposal%20sites

[61]  *Toxicological Profile for Di(2_ethylhexyl) Phthalate (DEHP),* U.S. Dept of Health and Human Services, January 2022, https://www.atsdr.cdc.gov/ToxProfiles/tp9.pdf (DEHP are listed as hazardous pollutants under the Clean Air Act.; DEHP is on the Proposition 65 list because it can cause cancer and birth defects or other reproductive harm).

[62]  Di(2-ethylhexyl) phthalate (DEHP), Proposition 65, California. Gov, https://www.p65warnings.ca.gov/fact-sheets/di2-ethylhexylphthalate-dehp

[63]  *Biomarkers Groups,* National Report on Human Exposure to Environmental Chemicals, Center for Disease Control, https://www.cdc.gov/exposurereport/pdf/Biomarker_Groups_Infographic-508.pdf

experimental animals, however the data available from cancer studies on humans was found to be inadequate to fully evaluate the relationship between human cancers and DEHP exposure.[64] .

115.    DEHP was first used in 1949 in the United States and was the most abundantly used phthalate derivative in the 20th century. [65]

116.    DEHP does not covalently bind to its parent material. Non-covalent bonds are weak and, as a result, DEHP readily leaches from its products, increasing human exposure.[66]

117.    Humans can be exposed to DEHP through ingestion, inhalation, and dermal contact for their lifetimes, including intrauterine life. [67]

118.    The Agency for Toxic Substances and Disease Registry ("ATSDR") estimates that the range of daily human exposure to DEHP is 3-30 µg/kg/day.[68]

119.    The no-observed-adverse-effect level for DEHP to humans is 4.8 mg/kg bodyweight/day and the tolerated daily intake (TDI) is 48 µg/kg bodyweight.[69]

---

[64] NTP (National Toxicology Program). 2021. Report on Carcinogens, Fifteenth Edition. Research Triangle Park, NC: U.S. Department of Health and Human Services, Public Health Service. https://ntp.niehs.nih.gov/go/roc15 DOI: https://doi.org/10.22427/NTP-OTHER-1003

[65] Pinar Erkekoglu & Belma Kocer-Gumusel, *Environmental Effects of Endocrine-Disrupting Chemicals: A Special Focus on Phthalates and Bisphenol A,* Environmental Health Risk, June 16, 2016, https://www.intechopen.com/chapters/50234

[66] Katelyn H. Wong & Timur Durrani, *Exposures to Endocrine Disrupting Chemicals in Consumer Products – A Guide for Pediatricians,* Current Problems in Pediatric and Adolescent Health Care, Science Direct, May 2017, https://www.sciencedirect.com/science/article/pii/S1538544217300822?via%3Dihub

[67] Schmidt, Juliane-Susanne, et al., *Effects of Di(2-ethylhexyl) Phthalate (DEHP) on Female Fertility and Adipoenesis in C3H/N Mice,* Environmental Health Perspective, May 15, 2012, http://www.ncbi.nlm.nih.gov/pmc/articles/PMC3440070

[68] Hannon, Patrick et al., *Daily Exposure to Di(2-ethylhexl) Phthalate Alters Estous Cyclicity and Accelerates Primordial Follicle Recruitment Potentially Via Dysregulation of the Phosphatidylinositiol 3-Kinase Signaling Pathway in Adult Mice,* Biology of Reproduction Volume 90, Issue 6, June 2014, 136, 1-11, https://academic.oup.com/biolreprod/article/90/6/136,%201-11/2514356

[69] Yufei Wang & Haifeng Qian, *Phthalates and Their Impacts on Human Health,* Healthcare (Basel) 9(5):603, May 18, 2021, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8157593/

| Endpoint | Cancer (NSRL) | | Developmental and Reproductive Toxicity (MADL) | |
|---|---|---|---|---|
| Route of Exposure | Oral | Inhalation | Oral | Inhalation |
| DEHP | 310 µg/day | N.C. | 410 µg/day | N.C. |

Source: OEHHA's safe harbor levels for TDCIPP, DBP, DEHP, benzene, and formaldehyde. N.C. = not calculated by OEHHA as of August 2020.[70]

120.   When DEHP enters in the human body, it breaks down into specific metabolites. The toxicity of DEHP is mainly attributed to its unique metabolites which include the primary metabolite, mono-(2-ethylhexyl) phthalate (MEHP) and secondary metabolites, mono-(2-ethyl-5-hydroxyhexyl) phthalate (MEHHP), and mono-(2-ethyl-5-oxohexyl) phthalate (MEOHP).[71]

121.   DEHP and its metabolites are known to cause significant adverse health effects including, but not limited to, endometriosis, developmental abnormalities, reproductive dysfunction, and infertility,[72] various cancers, and metabolic syndrome within the human population and their future children.[73]

---

[70]   Aalekhya Reddam & David Volz, *Inhalation of Two Prop 65-listed Chemicals Within Vehicles May Be Associated with Increased Cancer Risk,* Environmental International Volume 149, April 2021, https://www.sciencedirect.com/science/article/pii/SO16041202100026X

[71]   Saab, Yolande, et. Al., *Risk Assessment of Phthalates and Their Metabolites in Hospitalized Patients: A Focus on Di-and Mono-(2-ethylhexyl) Phthalates Exposure from Intravenous Plastic Bags.* Toxics, 10(7), 357, https://pubmed.ncbi.nlm.nih.gov/35878262/; Istaf Sheikh, et. Al., Endocrine disruption: In silico perspectives of interactions of di-(2-ethylhexyl) phthalate and its five major metabolites with progesterone receptor. BMC Structural Biology Volume 16, Suppl 1, 16, Sept. 30, 2016, https://bmcstructbiol.biomedcentral.com/articles/10.1186/s12900-016-0066-4 (Other secondary metabolites include mono (2-ethyl-5-carboxypentyl) phthalate (5-cx-MEPP) and mono[2-[carboxymethyl)hexylphthalate (2-cx-MMHP)).

[72]   Richardson, Kadeem et. Al., *Di(2-ethylhexyl) Phthalate (DEHP) Alters Proliferation and Uterine Gland Numbers in the Uterine of Adult Expose Mice,* Reproductive Toxicology, 77, 70-79, https://pubmed.ncbi.nlm.nih.gov/29458081/

[73]   Yufei Wang & Haifeng Qian, *Phthalates and Their Impacts on Human Health,* Healthcare (Basel) 9, 603, May 9, 2021, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8157593

122.     Studies on the health effects of DEHP in laboratory animals used oral inhalation, and dermal exposures. [74]

123.     The results of the studies indicate potential associations between DEHP exposure and the following negative health effects:

> **a)     Reproductive effects:** Epidemiological studies suggest a potential association between DEHP exposure and decreased serum testosterone and altered sperm parameters in males. Available studies on fertility effects in humans do not indicate an association between DEHP exposure and infertility. In animals, the available oral and inhalation studies provide evidence that the male reproductive system, particularly the testes, is susceptible to DEHP toxicity. Evidence from animal studies indicates decreased male and female fertility at high oral doses.

> **b)     Developmental effects.** Epidemiological studies suggest a potential association between reduced AGD (Anogenital distance) and testicular descent in male infants and prenatal DEHP exposure. In addition, human epidemiological studies provide mixed results for potential relationships between exposure to DEHP and preterm birth, early puberty, and delayed mental and psychomotor development in children. Studies in animals indicate that altered glucose homeostasis and the development of the reproductive system following early life exposure is a particularly sensitive target of DEHP toxicity.

124.     The global consumption of DEHP in 2020 was estimated at 3.07 million tons, and global demand for plasticizers continues to rise. The estimated global market of phthalates in 2020 was expected to reach $10 Billion and would still be widely used in plasticizers. [75]

125.     Human epidemiology studies have shown a significant association between phthalates exposures and adverse reproductive health outcomes in both women and men. [76]

---

[74]  Chapter 2: *Health Effects,* Toxicological profile for Di(2-ethylheyxl) phthalate (DEHP) (2001), https://www.atsdr.cdc.gov/ToxProfiles/tp9-c2.pdf
[75]  *Id.*
[76]  *Id.*

126.    DEHP exposure is also significantly related to insulin resistance, consistently higher systolic blood pressure, and other reproduction system problems including early menopause, low birth weight, pregnancy loss, and preterm birth. [77]

127.    When it comes to the impacts on children, epidemiology studies on phthalate toxicity have focused primarily on pregnancy outcomes, genital development, semen quality, precocious puberty, thyroid function, respiratory systems, and neurodevelopment. [78]

128.    Since the turn of the century, restrictions on phthalates have been proposed in many Asian and western countries. In 2008, the US Congress announced the Consumer Protection Safety Act (CPSA) that permanently banned the products, especially children's toys and childcare articles, containing DEHP, DBP, and BBP at levels >0.1% by weight.[79]

## B. Injuries Associated with Exposure to Endocrine Disrupting Chemicals

### a. Uterine Cancer

129.    Uterine cancer is associated with phthalate metabolites found in chemical hair straightening and hair relaxer products.

130.    Uterine cancer[80] is among the fourth most common cancer in women in developed countries, [81] accounting for about 3% of all new cancer cases each year.[82]

---

[77] N.M. Grindler, et al., *Exposure to Phthalate, an Endocrine Disrupting Chemical, Alters the First Trimester Placental Methylome and Transcriptome in Women,* Scientific Reports Volume 8, April 17, 2018, https://doi.org/10.1038/s41598-018-24505-w
[78] *Id.*
[79] Consumer Product Safety Improvement Act of 2008, H.R. 4040, 110th Cong. (2008), https://www.congress.gov/110/plaws/publ1314/PLAW-110publ314.pdf
[80] Otherwise known as endometrial carcinoma.
[81] Unaiza Faizan & Vijayadershan Muppidi, *Uterine Cancer,* In: StatPearls, National Library of Medicine, Jan 2022, https://www.ncbi.nlm.nih.gov/books/NBK562313
[82] *Cancer State Facts: Uterine Cancer,* National Cancer Institute, https://seer.cancer.gov/statfacts/html/corp.html

131.    Every year around 65,000 women develop uterine cancer in the United States, out of which more than 90% are of endometrial origin. The mean age at diagnosis is 61 years. [83]

132.    The incidence in Black women is twice that of White women. [84] In addition, Black women with uterine cancer carry a poorer prognosis as compared to White women. [85]

133.    Though death rates from other cancers in women have declined in recent years, death rates for uterine cancer have increased by more than 100% in the last 20 years.[86]

134.    Indeed, new cases of uterine cancer have increased by 0.6 percent per year from 2010 to 2019, and death rates have risen an average of 1.7 percent per year during the same period.[87]

135.    A recent study by the National Cancer Institute found that women who use chemical hair straightening or relaxing products have a considerably higher risk of contracting uterine cancer.[88]

136.    The study found that an estimated 1.64% of women who never used chemical hair straighteners or relaxers would go on to develop uterine cancer by the age of seventy; but for frequent users, that risk more than doubles, increasing to 4.05%.[89]

---

[83] *Id.*

[84] *Id.*

[85] Joel Sorosky, *Endometrial Cancer,* Obstetrics & Gynecology Volume 120, 383-97, Aug. 2012, https://pubmed.ncbi.nlm.nih.gov/22825101/

[86] Linda Duska, et al., *Treatment of Older Women With Endometrial Cancer: Improving Outcomes with Personalized Care,* American Society Clinical Oncology Educational Book, 35:164-74, 2016, https://pubmed.ncbi.nlm.nih.gov/27249697/

[87] Jack J. Lee, Rising Endometrial Cancer Rate Spur New Approaches to Prevention, National Cancer Institute: Division of Cancer Prevention, June 28, 2022, https://prevention.cancer.gov/news-and-events/blog/rising-endometrial-cancer

[88] Che-Jung Chang, et al., *Use of Straighteners and Other Hair Products and Incident Uterine Cancer,* Journal of the National Cancer Institute, Oct. 17, 2022, https://pubmed.ncbi.nlm.nih.gov/36245087/

[89] *Id.*

137.    These risks are more substantial among Black women, who use hair straightening and hair relaxing products the most, including Defendants' Products.

**b. Ovarian Cancer**

138.    Ovarian Cancer is a rare disease, making up approximately 1% of new cancer cases, with around 20,000 new cases diagnosed in the United States in 2022. Approximately 1.1% of all women will be diagnosed with ovarian cancer. Of the 10.6 per 100,000 women per year who will be diagnosed with ovarian cancer, the death rate is 6.3 per 100,000 women – a 49.7% survival rate.[90]

139.    While overall rates of ovarian cancer are slowly declining in the U.S., attributable in part to increased use of oral contraceptives, Black women continue to have the poorest survival rate across all ovarian cancer subtypes.[91]

140.    Another recent publication from the researchers of the Sister Study found the risk of ovarian cancer doubled with frequent use (defined as greater than four times per year) of chemical hair straighteners/relaxers in the previous year as opposed to never use. (HR = 2.19)[92]

141.    While the study was not powered to detect differences based on race/ethnicity, among Black women the hazard ratios were elevated for ever use of straighteners (HR = 1.28) or perms (HR = 1.80). Further, the researchers noted that "given the much higher prevalence of use

---

[90]  *Cancer State Facts; Ovarian Cancer,* National Cancer Institute, https://seer.cancer.gov/statfacts/html/ovary.html.
[91]  Park H.K., et al. *Recent Trends in Ovarian Cancer Incidence and Relative Survival in the United States by Race/Ethnicity and Histologic Subtypes.* Cancer Epidemiol. Biomarkers Prev. 2017;26 (10): 1511-1518. doi: 10.1158/1055-9965.EPI-17-0290.
[92]  White A.J., et al. *Use of hair products in relation to ovarian cancer risk.* Carcinogenesis 2021; 42(9):1189-1195

of these products, the impact of these results is more relevant for African American/Black women."[93]

### c. Endometriosis

142.    Endometriosis is associated with phthalate metabolites found in chemical hair straightening and hair relaxer products.

143.    For Black women in the U.S., endometriosis is one of the most common indications for major gynecological surgery such as a hysterectomy. It is associated with long hospital stays and high hospital costs.[94]

144.    One study demonstrated Phthalate metabolites promote increased endometrial volume, often an indication of fibroids on ultrasound.[95] DEHP increased volume risk by 33% and the sum of androgenic phthalates increased risk by 27%.[96]

145.    The function of the uterine lining, the endometrium, is based on cell-cell interactions under the instruction of steroid hormones.[97] Endometriosis, a common cause of female infertility, occurs almost exclusively in menstruating women of reproductive age and often results from disruptions of this well-balanced hormonal cellular equilibrium.[98]

---

[93] *Id.*

[94] M.C. Kyama, *The prevalence of endometriosis among African-American and African-indigenous women.* Gynecologic and obstetric investigation, Vol. 57(1) (2004), https://pubmed.ncbi.nlm.nih.gov/14974452

[95] Amir R. Zota et al., *Phthalates exposure and uterine fibroid burden among women undergoing surgical treatment for fibroids: a preliminary study,* Fertility and sterility, Vol. 111(1) (2019), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6321778/

[96] *Id.*

[97] L. Cobellis et al., *High plasma concentrations of di-(2-ethylhexl)-phthalate in women with endometriosis,* Human Reproduction, Vol. 18, Issue 7 (2003), 1512-1515, https://doi.org/10.1093/humrep/deg254

[98] D.L. Olive and L. B. Schwartz, *Endometriosis,* The New England J. of Med., Vol. 328(24):1759-69 (1993), https://pubmed.ncbi.nlm.nih.gov/8110213/; K.G. Osteen and E. Sierra-Rivera, *Does disruption of immune and endocrine systems by environmental toxins contribute to*

146.    It is estimated that 20% to 50% of women being treated for infertility have endometriosis. [99]

147.    Endometriosis is a painful, estrogen dependent disease resulting from the growth of endometrial glands and stroma outside the uterus that causes a chronic inflammatory reaction.[100]

148.    During the follicular phase of the menstrual cycle, estrogen, working through estrogen receptors[101], induces growth of the endometrium. [102]

149.    A developing fetus and the female reproductive tract are particularly susceptible to EDCs.[103] EDCs are known to interfere with hormonal homeostasis, leading to alteration of estrogen signaling. [104] Specifically, DEHP is known to cause enhanced estrogenic activity. [105]

---

*development of endometriosis?,* Seminars in Reproductive Endocrinology, Vol. 15 (3):301-8 (1997) https://pubmed.ncbi.nlm.nih.gov/938389/

[99]  *Endometriosis,* World Health Organization (March 31, 2021), https://www.who.int/news-room/fact-sheets/detail/endometriosis

[100] *Id.*

[101] Illaria Paterni et al., *Estrogen receptors alpha (ERα) and beta (Erβ): subtype-selective ligands and clinical potential,* Steroids, Vol. 90:13-29 (2014), https://pubmed.ncbi.nlm.nih.gov/24971815/

[102] Kun Yu et al., *Estrogen Receptor Function: Impact on the Human Endometrium,* Frontiers in endocrinology, Vol. 13 (2022), https://pubmed.ncbi.nlm.nih.gov/35285981/

[103] Saniya Rattan et al., *Di(2-Ethylhexyl) Phthalate Exposure During Prenatal Development Causes Adverse Transgenerational Effects on Female Fertility in Mice,* Toxicol Sci., Vol. 163 (2) (2018), https://www.nci.nlm.nih.gov/pmc/articles/PMC5974785/

[104] Xueping Chen et al., *Toxicity and Estrogenic Endocrine Disrupting Activity of Phthalates and Their Mixtures,* Int'l J. Envitl. Res. And Pub. Health, 1(3(:3156-3168 (2014) https://doi.org/10.3390/ijerph110303156

[105] Chou CK, Huang HW, Yang CF, Dahms HU, Liang SS, Wang TN, Kuo PL, Hsi E, Tsai EM, Chiu CC. *Reduced camptothecin sensitivity of estrogen receptor-positive human breast cancer cells following exposure to di(2-ethylhexyl)phthalate (DEHP) is associated with DNA methylation changes.* Environ Toxicol. 2019 Apr;34(4):401-414. doi: 10.1002/tox.22694. Epub 2019 Feb 5. PMID: 30720231.

150.     DEHP exposure has been demonstrated to promote atypical cell proliferation and increased uterine volume (weight) in female mice. [106]

151.     Numerous studies, spanning decades, establish that DEHP can lead to the development of endometriosis, as it is known to increase the viability, activity, proliferation, and migration of endometrial stromal cells, a required precondition of endometriosis. [107]

152.     Studies have shown that endometriotic women have significantly higher plasma DEHP concentrations than those without the disease.[108] A study that included a sample size of approximately five hundred women living in various states observed that DEHP's metabolite MEHP was consistently associated with endometriosis.[109]

**C. Ms. Perez's Use of Hair Relaxing Products**

153.     Ms. Perez was first exposed to Defendants' EDCs and phthalate-laden Products in the late 1980s, at or around her preteen years, when she began using Defendants' Products.

154.     Ms. Perez used Defendants' Products by applying the product herself or with family following Defendants' instructions, or by going to a professional salon with friends and having them apply Defendants' Products as instructed by Defendants.

---

[106]  Juhye Kim, et al., *Chronic Low-Dose Nonylphenol or Di-(2-ethylhexyl) Phthalate has a Different Estrogen-like Response in Mouse Uterus, Development & Reproduction, Vol. 22(4):379-391(2018),* https://pubmed.ncbi.nlm.nih.gov/30680337/
[107]  *Id.*
[108]  L. Cobellis et al., *High plasma concentrations of di-(2-ethylhexl)-phthalate in women with endometriosis,* Human Reproduction, Vol. 18, Issue 7 (2003), 1512-1515, https://doi.org/10.1093/humrep/deg254 (Concluded that 92.6% of women with endometriosis tested had detectable levels of DEHP and/or its metabolite, MEHP.
[109]  Buck Louis G.M. et al., *Bisphenol A and phthalates and endometriosis: the Endometriosis: Natural History, Diagnosis and Outcomes Study,* Fertility and sterility, Vol. 100(1):162-9.e1-2 (2013), https://pubmed.ncbi.nlm.nih.gov/23579005/

155.    Ms. Perez continued using Defendants' Products until around 2022, using the Products every eight to twelve weeks throughout this time, resulting in 32+ years of consistent exposure.

156.    Mrs. Perez would keep the Defendants' Products on her hair for the time recommended in the instructions.

157.    There was never any indication on any of the Defendants' Products' packaging or otherwise that this normal use could and would cause her to develop uterine cancer.

158.    On November 6, 2019 Ms. Perez was diagnosed with endometrial adenocarcinoma (uterine cancer).

159.    Ms. Perez underwent surgical treatments for her cancer including an ablation, D&C procedures, and Megace therapies.

160.    As a result of Defendants' acts and/or omissions, Ms. Perez suffered extreme pain and suffering, and emotional distress.

## COUNT ONE – STRICT LIABILITY
### (FAILURE TO WARN)

161.    Plaintiff hereby incorporates by reference each of the preceding paragraphs as if fully set forth herein.

162.    At all relevant times, the Defendants were manufacturing, marketing, testing, promoting, selling and/or distributing the Products in the regular course of business.

163.    At all relevant times, Plaintiff used the Products on her hair and scalp area, which is a reasonably foreseeable and intended use.

164.    At all relevant times, Defendants in this action knew or should have known that the use of phthalates and other EDCs in their hair Products significantly increases the risk of diseases

including but not limited to cancer and endometriosis, based upon scientific knowledge dating back for decades.

165.    At all relevant times, including the time of sale and consumption, the Products, when put to reasonably foreseeable use, were in an unreasonably dangerous and defective condition because they failed to contain adequate and proper warnings and/or instructions regarding the increased risk of diseases, including but not limited to cancer and endometriosis, associated with the use of Defendants' hair Products. Defendants failed to properly and adequately warn and instruct Plaintiff as to the inherent risks of these debilitating and life-altering conditions.

166.    Had Plaintiff received a warning that the use of the Products would significantly increase her risk of developing uterine cancer, she would never have used them. As a proximate result of Defendants' design, manufacture, marketing, sale, and distribution of the Products, Plaintiff was injured catastrophically, and was caused severe pain, suffering, disability, impairment, loss of enjoyment of life, loss of care, comfort, and other economic damages.

167.    The development of uterine cancer by Plaintiff was the direct and proximate result of the unreasonably dangerous and defective condition of the Products at the time of sale and consumption, including their lack of warnings; Plaintiff suffered injuries and damages including, but not limited to, physical and mental pain and suffering, and past and future medical expenses.

168.    Defendants' Products were defective because they failed to contain warnings and/or instructions, and breached express warranties, and/or failed to conform to express factual representations upon which Plaintiff justifiably relied in electing to use the Products. The defect or defects made the Products unreasonably dangerous to persons such as Plaintiff, who could reasonably be expected to use and rely upon such Products. As a result, the defect or defects were a producing cause of Plaintiff's injuries and damages.

169.     Defendants' Products failed to contain, and to this day fail to contain, adequate warnings and/or instructions regarding the increased risk of diseases, including but not limited to cancer and endometriosis, with the use of their Products by women. Defendants continue to market, advertise, and expressly represent to the general public that it is safe for women to use their relaxer Products. These Defendants continue with these marketing and advertising campaigns despite having scientific knowledge that their Products contained chemicals and other ingredients that could and would increase women's risk of developing these debilitating, life-altering, and potentially fatal diseases.

170.     Plaintiff sustained the following damages as a foreseeable, direct, and proximate result of the Defendants' acts and/or omissions:

      a.   Economic losses including medical care and lost earnings; and

      b.   Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of past quality of life.

## COUNT TWO – STRICT LIABILITY
### (DESIGN AND/OR MANUFACTURING DEFECT)

171.     Plaintiff hereby incorporates by reference each of the preceding paragraphs as if fully set forth herein.

172.     Defendants engaged in the design, development, manufacture, marketing, sale, and distribution of the Products in a defective and unreasonably dangerous condition to consumers, including Plaintiff.

173.     Defendants caused the Products to enter the stream of commerce and to be sold through various retailers, where Plaintiff purchased the Products.

174.    The Products were expected to, and did, reach consumers, including Plaintiff, without change in the condition in which they were manufactured and sold by Defendants and/or otherwise placed into the stream of commerce.

175.    Plaintiff used the Products in a manner normally intended, recommended, promoted, and marketed by Defendants.

176.    Products failed to perform safely when used by Plaintiff in a reasonably foreseeable manner, specifically increasing her risk of developing uterine cancer.

177.    The propensity of phthalates and other endocrine disrupting chemicals to initiate and promote tumors and cancerous growths in women, thereby substantially increasing the risk of diseases, including but not limited to, cancer renders the Products unreasonably dangerous when used in the manner intended, and to an extent beyond what would be contemplated by the ordinary consumer.

178.    Importantly, the Products are an inessential cosmetic product that do not treat or cure any disease or health condition. Further, safer alternatives, including fragrance free products, have been available for decades.

179.    Defendants have known, or should have known, that the Products are unreasonably dangerous, but have continued to design, manufacture, sell, distribute, market, promote, and supply the Products so as to maximize sales and profits all at the expense of public health and safety, in conscious disregard of the foreseeable harm to the consuming public, including Plaintiff.

180.    Plaintiff sustained the following damages as a foreseeable, direct, and proximate result of the Defendants' acts and/or omissions:

      a.   Economic losses including medical care and lost earnings; and

b. Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of past quality of life.

## COUNT THREE – STRICT LIABILITY
### (DESIGN AND/OR MANUFACTURING DEFECT)

181. Plaintiff hereby incorporates by reference each of the preceding paragraphs as if fully set forth herein.

182. At all relevant times Defendants engaged in the design, development, manufacture, marketing, sale, and distribution of the Products in a defective and unreasonably dangerous condition to consumers, including Plaintiff.

183. Defendants caused the Products to enter the stream of commerce and be sold through various retailers, where Plaintiff purchased the Products.

184. The Products were expected to, and did, reach consumers, including Plaintiff, without change in the condition in which they were manufactured and sold by Defendants and/or otherwise placed into the stream of commerce.

185. Plaintiff used the Products in a manner normally intended, recommended, promoted, and marketed by Defendants.

186. Products failed to perform safely when used by Plaintiff in a reasonably foreseeable manner, specifically increasing her risk of developing uterine cancer.

187. The propensity of phthalates and other endocrine disrupting chemicals to initiate and promote cancerous growths in women, thereby substantially increasing the risk of diseases including, but not limited to, cancer renders the Products unreasonably dangerous when used in the manner intended, and to an extent beyond what would be contemplated by the ordinary consumer.

188.    Importantly, the Products are an inessential cosmetic that do not treat or cure any disease or health condition. Further, safer alternatives, including fragrance free products, have been readily available for decades.

189.    Defendants knew, or by the exercise of reasonable care should have known, that the Products are unreasonably dangerous. However, they have continued to design, manufacture, sell, distribute, market, promote, and supply the Products to maximize sales and profits at the expense of public health and safety, in conscious disregard of the foreseeable harm to the consuming public, including Plaintiff.

190.    Defendants owed a duty to all reasonably foreseeable users to design a safe product.

191.    Defendants breached their duty by failing to use reasonable care in the design and/or manufacturing of their Products because the Products were unreasonably dangerous in that they increase the risks of tumors and cancerous growths in women, thereby substantially increasing the risk of diseases including but not limited to cancer. This renders the Products unreasonably dangerous when used in a manner that was intended by the Defendants, and to an extent beyond that which would be contemplated by the ordinary consumer.

192.    Defendants also breached their duty by failing to use reasonable care by failing to use cost-effective, safer, and reasonably feasible alternative designs in the design and/or manufacturing of their Products.

193.    A reasonable company under the same or similar circumstances would have designed a safer product.

194.    Plaintiff sustained the following damages as a foreseeable, direct, and proximate result of the Defendants' acts and/or omissions:

    a.   Economic losses including medical care and lost earnings; and

b. Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of past quality of life.

## COUNT FOUR – PRODUCTS LIABILITY
### (NEGLIGENT FAILURE TO WARN)

195. Plaintiff hereby incorporates by reference each of the preceding paragraphs as if fully set forth herein.

196. At all relevant times, Defendants engaged in the design, development, manufacture, marketing, sale, and distribution of the Products in a defective and unreasonably dangerous condition to consumers, including Plaintiff.

197. Defendants knew, or by the exercise of reasonable care, should have known the use of their Products was dangerous, harmful, and injurious when used by Plaintiff in a reasonably foreseeable manner.

198. Defendants knew, or by the exercise of reasonable care, should have known ordinary consumers such as Plaintiff would not have realized the potential risks and dangers of their Products, and that Products were likely to increase the risks of tumors and cancerous growths in women, thereby substantially increasing the risk of cancer, when used in the manner intended, and to an extent beyond that which would be contemplated by the ordinary consumer.

199. Defendants owed a duty to all reasonably foreseeable consumers to disclose the risks associated with the use of their Products.

200. Defendants breached their duty of care by failing to use reasonable care in providing adequate warnings on their Products, including that Products were likely to increase the risks of tumors and cancerous growths in women, thereby substantially increasing the risk of

diseases including but not limited to cancer when used in the manner intended and to an extent beyond that which would be contemplated by the ordinary consumer.

201. The failure of Defendants to adequately warn about their defective Products, and their efforts to misleadingly advertise through conventional avenues, created a danger of injuries described herein that were reasonably foreseeable at the time of design and/or manufacture and distribution.

202. At all relevant times, Defendants could have provided adequate warnings and instructions to prevent the harms and injuries set forth herein, such as providing full and accurate information about the Products in advertising.

203. A reasonable company under the same or similar circumstances would have warned and instructed of the dangers.

204. Plaintiff was injured as a direct and proximate result of Defendants' failure to warn and instruct because she would not have used the Products had she received adequate warnings and instructions that the Products could increase the risks of tumors and cancerous growths in women, thereby substantially increasing the risk of diseases including but not limited to cancer when used in the manner intended, and to an extent beyond that would be contemplated by the ordinary consumer.

205. Defendants' lack of adequate and sufficient warnings and instructions, and their inadequate and misleading advertising, was a substantial contributing factor in causing harm to Plaintiff.

206. Plaintiff sustained the following damages as a foreseeable, direct, and proximate result of the Defendants' acts and/or omissions:

    a. Economic losses including medical care and lost earnings; and

b. Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of past quality of life.

## COUNT FIVE – NEGLIEGENCE
## (DESIGN AND/OR MANUFACTURING DEFECT)

207.    Plaintiff hereby incorporates by reference each of the preceding paragraphs as if fully set forth herein.

208.    At all relevant times, Defendants engaged in the design, development, manufacture, marketing, sale, and distribution of the Products in a defective and unreasonably dangerous condition to consumers, including Plaintiff.

209.    Defendants caused the Products to enter the stream of commerce and to be sold through various retailers, where Plaintiff purchased the Products.

210.    The Products were expected to, and did, reach consumers, including Plaintiff, without change in the condition in which they were manufactured and sold by Defendants and/or otherwise placed into the stream of commerce.

211.    Plaintiff used the Products in a manner intended, recommended, promoted, and marketed by Defendants.

212.    The Products failed to perform safely when used by Plaintiff in a reasonably foreseeable manner, specifically increasing her risk of developing uterine cancer.

213.    The propensity of phthalates and other endocrine disrupting chemicals to initiate tumors and cancerous growths in women, thereby substantially increasing the risk of diseases including, but not limited to, cancer renders the Products unreasonably dangerous when used in the manner they were intended, and to an extent beyond that which would be contemplated by the ordinary consumer.

214. Importantly, the Products are an inessential cosmetic product that do not treat or cure any disease or health condition. Further, safer alternatives, including fragrance free products, have been readily available for decades.

215. Defendants knew, or by the exercise of reasonable care should have known, that the Products are unreasonably dangerous. However, they have continued to design, manufacture, sell, distribute, market, promote, and supply the Products to maximize sales and profits at the expense of public health and safety in conscious disregard of the foreseeable harm to the consuming public, including Plaintiff.

216. Defendants owed a duty to all reasonably foreseeable users to design a safe product.

217. Defendants breached their duty by failing to use reasonable care in the design and/or manufacturing of their Products because Products were unreasonably dangerous in that they increase the risks of tumors and cancerous growths in women, thereby substantially increasing the risk of diseases including but not limited to cancer, rendering the Products unreasonably dangerous when used in the manner intended, and to an extent beyond that which would be contemplated by the ordinary consumer.

218. Defendants also breached their duty by failing to use reasonable care by failing to use cost-effective, safer, reasonably feasible alternative designs in the design and/or manufacturing of their Products.

219. A reasonable company under the same or similar circumstances would have designed a safer product.

220. Plaintiff sustained the following damages as a foreseeable, direct, and proximate result of the Defendants' acts and/or omissions:

    a. Economic losses including medical care and lost earnings; and

b. Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of past quality of life.

## COUNT SIX – NEGLIGENCE
### (NEGLIGENCE AND/OR GROSS NEGLIGENCE)

221.    Plaintiff hereby incorporates by reference each of the preceding paragraphs as if fully set forth herein.

222.    The Defendants' negligence and extreme carelessness includes, but is not limited to, their marketing, designing, manufacturing, producing, supplying, inspecting, testing, selling and/or distributing the Products in one or more of the following respects:

a.    In failing to warn Plaintiff of the hazards associated with the use of the Products;

b.    In failing to properly test their Products to determine adequacy and effectiveness of safety measures, if any, prior to releasing the Products for consumer use;

c.    In failing to properly test their Products to determine the increased risk of diseases such as uterine cancer, ovarian cancer, and endometriosis during the normal and/or intended use of the Products;

d.    In failing to inform ultimate users such as Plaintiff as to the safe and proper methods of handling and using the Products;

e.    In failing to remove the Products from the market when Defendants knew or should have known the Products were defective;

49

    f.   In failing to instruct the ultimate users, such as Plaintiff, as to the methods for reducing the type of exposure to the Products which caused increased risk of diseases such as uterine cancer, ovarian cancer, and endometriosis;

    g.   In failing to inform the public in general and Plaintiff in particular of the known dangers of using the Products;

    h.   In failing to advise users how to prevent or reduce exposure that caused increased risk for diseases such as uterine cancer, ovarian cancer, and endometriosis;

    i.   In marketing and labeling the Products as safe for all uses despite knowledge to the contrary;

    j.   In failing to act like a reasonably prudent company under similar circumstances. Each and all of these acts and omissions, taken singularly or in combination, were a proximate cause of the injuries and damages sustained by Plaintiff.

223.   At all relevant times, the Defendants knew or should have known that the Products were unreasonably dangerous and defective when put to their reasonably anticipated use.

224.   Defendants' acts and/or omissions constitute gross negligence because they constitute a total lack of care and extreme departure from what a reasonably careful company would do in the same situation to prevent foreseeable harm to Plaintiff.

225.   Defendants acted and/or failed to act willfully, and with conscious and reckless disregard for the rights and interests of Plaintiff, and their acts and omissions had a great probability of causing significant harm and in fact resulted in such harm to Plaintiff.

226.    Plaintiff was injured as a direct and proximate result of negligence and/or gross negligence as described herein.

227.    Defendants' negligence and/or gross negligence were a substantial factor in causing and/or contributing to Plaintiff's injuries.

228.    Plaintiff sustained the following damages as a foreseeable, direct, and proximate result of the Defendants' acts and/or omissions:

  a.  Economic losses including medical care and lost earnings; and

  b.  Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of past quality of life.


## COUNT SEVEN – NEGLIGENCE
## (NEGLIGENT MISREPRESENTATION)

229.    Plaintiff hereby incorporates by reference each of the preceding paragraphs as if fully set forth herein.

230.    Defendants had a duty to accurately and truthfully represent to consumers, Plaintiff, and the public that the Products had been tested and found to be safe and effective for use. The representations made by Defendants were in fact false.

231.    Defendants failed to exercise ordinary care in the representations concerning the Products while they were involved in their manufacture, sale, testing, quality, assurance, quality control, and distribution in interstate commerce, because Defendants negligently misrepresented the Products' substantial risk of unreasonable, dangerous, and adverse side effects.

232.    Defendants breached their duty in representing that the Products have no serious side effects.

233.   As a foreseeable, direct and proximate result of the negligent misrepresentation of Defendants as set forth herein, Defendants knew, and had reason to know, that the Products had been insufficiently tested, or had not been tested at all , and that they lacked adequate and accurate warnings, and that they created a high risk, and/or higher than acceptable risk, and/or higher than reported and represented risk, of adverse side effects, including but not limited to uterine cancer and/or endometriosis.

234.   Plaintiff sustained the following damages as a foreseeable, direct, and proximate result of the Defendants' acts and/or omissions:

    a.   Economic losses including medical care and lost earnings; and

    b.   Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of past quality of life.

### COUNT EIGHT – VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE TRADE PRACTICES ACT
### (815 ILCS 505/1 eq seq.)

235.   Plaintiff hereby incorporates by reference each of the preceding paragraphs as if fully set forth herein.

236.   The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/2, states that, "[u]nfair methods of competition and unfair or deceptive acts or practices…are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby."

237. By the conduct described in detail above and incorporated herein, Defendant engaged in unfair or deceptive acts in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act.

238. Plaintiff purchased and used Defendants' Products primarily for personal use and thereby suffered ascertainable losses because of Defendants' actions in violation of the consumer protection laws.

239. Had Defendants not engaged in deceptive conduct described herein, Plaintiff would not have purchased and/or paid for Defendants' product and would not have incurred related injuries and damages.

240. Defendants engaged in wrongful conduct while at the same time obtaining, under false pretenses, monetary gain from Plaintiff for the Products that would not have been paid had Defendants not engaged in unfair and deceptive conduct.

241. Defendants engaged in unfair methods of competition and deceptive acts or practices that were proscribed by law, including the following:

     a. Representing that goods or services have characteristics, ingredients, uses, benefits, or quantities that they do not have;

     b. Advertising goods or services with the intent not to sell them as advertised; and

     c. Engaging in fraudulent or deceptive conduct that created a likelihood of confusion or misunderstanding.

242. Defendants intended for Plaintiff to rely on their representations and advertisements regarding the Products in order to achieve monetary gain from Plaintiff through her purchase of the Products.

243.     Plaintiff was injured by the cumulative and indivisible nature of Defendants'
conduct. The cumulative effect of Defendants' conduct directed at Plaintiff and other consumers
was to create demand for and sell the Products. Each aspect of Defendants' conduct combined to
artificially create sales of the product.

244.     Defendants have a statutory duty to refrain from unfair or deceptive acts or trade
practices in the design, labeling, development, manufacture, promotion, and sale of the Products.

245.     Had Defendants not engaged in the deceptive conduct described above, Plaintiff
would not have purchased and/or paid for the Products and would not have incurred related injuries
and damages.

246.     Defendants' intentional, deceptive, unconscionable, and fraudulent representations
and material omissions to Plaintiff, cosmetologists, physicians, and consumers, constituted unfair
and deceptive acts and trade practices in violation of Illinois consumer protection laws.

247.     Defendants' actions, as complained of herein, constitute unfair competition or
unfair, unconscionable, deceptive, or fraudulent acts, or trade practices in violation of Illinois
consumer protection laws.

248.     Defendants have engaged in unfair competition or unfair or deceptive acts or trade
practices or have made false representations in violation of the Illinois Consumer Fraud and
Deceptive Trade Practices Act.

249.     Under these statutes, Defendants are the suppliers, manufacturers, advertisers, and
sellers, who are subject to liability under such legislation for unfair, deceptive, fraudulent, and
unconscionable consumer sales practices.

250.     Defendants violated the statutes that were enacted to protect consumers against
unfair, deceptive, fraudulent, and unconscionable trade and business practices and false

advertising, by knowingly and falsely representing that Defendants' Products were fit to be used for the purposes intended, when in fact they were defective and dangerous, and by other acts alleged herein. These representations were made in marketing and promotional materials.

251.    The actions and omissions of Defendants alleged herein are uncured or incurable deceptive acts under the statutes enacted to protect consumers against unfair, deceptive, fraudulent, and unconscionable trade and business practices and false advertising.

252.    Defendants had actual knowledge of the defective and dangerous condition of Defendants' Products and failed to take any action to cure such defective and dangerous conditions.

253.    Plaintiff relied upon Defendants' misrepresentations and omissions in determining which products to use.

254.    Defendants' deceptive, unconscionable, or fraudulent representations and material omissions to Plaintiff and other consumers constitute deceptive acts and practices.

255.    By reason of the unlawful acts engaged in by Defendants, and as a direct and proximate result thereof, Plaintiff suffered ascertainable losses and damages.

256.    Plaintiff sustained the following damages as a foreseeable, direct, and proximate result of the Defendants' acts and/or omissions:

      a.  Economic losses including medical care and lost earnings; and

      b.  Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of past quality of life.

## COUNT NINE - FRAUD

257.    Plaintiff hereby incorporates by reference each of the preceding paragraphs as if fully set forth herein.

258.    Defendants, who engaged in the development, manufacture, marketing, sale, and distribution of cosmetic and personal care products, including the Products, owed a duty to provide accurate and complete information regarding their Products.

259.    Defendants fraudulently misrepresented the use of the Products as safe and effective, specifically:

    a.    Defendant Luster's Products Pink is marketed as containing Shea Butter and Olive Oil and that it "contains condition agents to help nourish and help protect hair."

    b.    Defendant Luster's Product Smooth Touch is marketed as containing Extra Virgin Olive Oil and Argan Oil "to nourish and deliver incredible shine."

    c.    Defendant L'Oreal's Product Dark & Lovely is marketed as "Nourishing Care" and with Argan Oil and Vitamin E, implying that it contains natural, beneficial, and healthy ingredients.

    d.    Defendant Godrej Product African Pride is marketed as an "Olive Miracle" that is enriched with "African Shea Butter, Olive Oil, & Herbal Oil Extracts." It is described as a deep conditioning anti-breakage relaxer that is implied to be healthy and safe.

    e.    Defendant Beauty Bell Enterprises, LLC. d/b/a House of Cheatham, Inc.'s Africa's Best brand is intentionally labeled as "Herbal" and using "African Herbal Extracts with Extra Virgin Olive Oil" in marketing their products, while

also claiming that their product "restores essential moisture, nutrients and vitamins to your hair."

260.    On October 4, 2022, Yahoo, MSN and many other online news websites published an article titled "The Relaxer Box Girls: Where Are They Now", which revealed that many of the young Black girls that were featured on relaxer boxes and advertisements throughout the 1980s, 1990s, and 2000s, never actually got their hair relaxed, and never used any of the Products in question. Instead, they used other straightening tools, technology, and styling products to achieve the look of having used Defendants' Products, without having exposed themselves to the dangerous chemicals contained within Defendants' relaxers. Many of these women are wearing natural hairstyles today.[110]

261.    Defendants knew that these misrepresentations and/or omissions were material, and that they were false, incomplete, misleading, deceptive, and deceitful when they were made.

262.    Defendants made the misrepresentations and/or omissions for the purpose of deceiving and defrauding consumers, including Plaintiff, with the intention of having them act and rely on such misrepresentations and omissions.

263.    Plaintiff relied, with reasonable justification, on the misrepresentations by Defendants, which induced her to purchase and use the Products on a regular basis for decades.

264.    Defendants profited significantly from their unethical and illegal conduct that fraudulently induced Plaintiff and millions of other consumers to purchase a dangerous and defective product.

---

[110] The Relaxer Box Girls: Where Are They Now?, https://news.yahoo.com/relaxer-box-girls-where-now-192747557.html

265. Defendants' actions, and Plaintiff's justifiable reliance thereon, were substantial contributing factors in causing injury and incurrence of substantial damage.

266. Plaintiff sustained the following damages as a foreseeable, direct, and proximate result of the Defendants' acts and/or omissions:

    a. Economic losses including medical care and lost earnings; and

    b. Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of past quality of life.

## COUNT TEN – FRAUDULENT CONCEALMENT

267. Plaintiff hereby incorporates by reference each of the preceding paragraphs as if fully set forth herein.

268. Defendants owed consumers, including Plaintiff, a duty to disclose all material facts fully and accurately regarding the Products, not to conceal material defects related thereto, not to place these defective Products into the stream of commerce, and to fully and accurately label product packaging. To the contrary, Defendants explicitly and/or implicitly represented that the Products were safe and effective.

269. Defendants actively and intentionally concealed and/or suppressed material facts, in whole or in part, to induce consumers, including Plaintiff, to purchase and use the Products and did so at her expense. Specifically, Defendants have been aware of the positive association between phthalates and other endocrine disrupting chemicals used in their Products and an increased risk of ovarian cancer, uterine cancer, and endometriosis demonstrated by epidemiology studies that

showed exposure to phthalates in their Products enhance invasive and proliferative activities of endometrial cells.

270.     Recent studies have established a statistically significant association between Defendants' Products and uterine fibroids and uterine cancer. The development of fibroids can also be a precursor to and increase the risk of uterine cancer in women.

271.     Defendants made the misrepresentations and/or omissions for the purpose of deceiving and defrauding Plaintiff and with the intention of having her act and rely on such misrepresentations and/or omissions.

272.     Defendants knew that their concealments, misrepresentations and/or omissions were material, and that they were false, incomplete, misleading, deceptive, and deceitful at the time they were made. Alternatively, Defendants concealed information, and/or made the representations with such reckless disregard for the truth that knowledge of the falsity can be imputed to them.

273.     Defendants profited significantly from their unethical and illegal conduct that caused Plaintiff to purchase and habitually use a dangerous and defective product.

274.     Defendants' actions and representations, and Plaintiff's justifiable reliance thereon, were substantial contributing factors in causing injury and incurrence of substantial damages.

275.     Plaintiff sustained the following damages as a foreseeable, direct, and proximate result of the Defendants' acts and/or omissions:

   a.  Economic losses including medical care and lost earnings; and

   b.  Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of past quality of life.

## COUNT ELEVEN – BREACH OF EXPRESS WARRANTY

276.    Plaintiff hereby incorporates by reference each of the preceding paragraphs as if fully set forth herein.

277.    Defendants expressly warranted, through direct-to-consumer marketing, advertisements, and labels, that the Products were safe and effective for reasonably anticipated users.

278.    The Products did not conform to these express representations because they can cause significant injury, including but not limited to uterine cancer, ovarian cancer, and endometriosis when used in the manner directed by Defendants.

279.    Plaintiff sustained the following damages as a foreseeable, direct, and proximate result of the Defendants' acts and/or omissions:

   a.   Economic losses including medical care and lost earnings; and

   b.   Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of past quality of life.

## COUNT TWELVE – BREACH OF IMPLIED WARRANTIES

280.    Plaintiff hereby incorporates by reference each of the preceding paragraphs as if fully set forth herein.

281.    At the time the Defendants manufactured, marketed, labeled, promoted, distributed and/or sold the Products, the Defendants knew of the uses for which the Products were intended and impliedly warranted the Products to be of merchantable quality and safe for such use.

282.    Defendants breached their implied warranties of the Products sold to Plaintiff because they were not fit for their common, ordinary, and intended uses.

283.   Plaintiff sustained the following damages as a foreseeable, direct, and proximate result of the Defendants' acts and/or omissions:

    a.  Economic losses including medical care and lost earnings; and

    b.  Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of past quality of life.

### COUNT THIRTEEN – NEGLIGENT FAILURE TO RECALL

284.    Plaintiff hereby incorporates by reference each of the preceding paragraphs as if fully set forth herein.

285.   At all relevant times, Defendants designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefitted from the Products and therefore, owed a duty of reasonable care to avoid causing harm to those who used the Products, such as Plaintiff.

286.   Defendants knew or should have known through the exercise of reasonable care, the risks to consumers posed by the Products.

287.   Defendants knew or, by the exercise of reasonable care, should have known use of the Products was harmful and had the potential to increase the risks of endometriosis and/or cancer in women, and as such, renders the Products unreasonably dangerous when used in the manner intended, and to an extent beyond that which would be contemplated by an ordinary consumer.

288.   Defendants owed a duty to the users of the Products, including Plaintiff, to exercise reasonable care in conducting their business to properly and reasonably design, research, develop, manufacture, produce, process, assemble, inspect, supply, distribute, deliver, broker, market, warn,

maintain, repair, modify, recall, retrofit, engineer, test, recommend, advertise, and/or make available the Products.

289.    Defendants also owed a continuing duty to Plaintiff to remove, recall, or retrofit the unsafe and/or defective Products across the United States (including in Plaintiff's state and case).

290.    Defendants knew or reasonably should have known that the Products were dangerous and not safe for use.

291.    Defendants knew or, in the exercise of reasonable and ordinary care, should have known that the Products were defective and unsafe for Plaintiff, who is a person likely to use the Products for the purpose and in the manner for which the Products were intended to be used and for purposes reasonably foreseeable by Defendants.

292.    At all times, Defendants negligently breached said duties and unreasonably and negligently allowed the Products to be used by Plaintiff without proper recall or warning.

293.    Defendants to this day have not made any reasonable effort to remove and/or retrofit the serious safety risk posed by the Products to consumers.

294.    In failing to properly recall and/or retrofit the Products, or even warn of the serious safety risks the Products pose to consumers and the public, Defendants have failed to act as a reasonable manufacturer, designer, or distributor would under the same or similar circumstances and failed to exercise reasonable care.

295.    Plaintiff was injured as a direct and proximate result of the negligent conduct as described herein.

296.    Plaintiff sustained the following damages as a foreseeable, direct, and proximate result of the Defendants' acts and/or omissions:

        a.  Economic losses including medical care and lost earnings; and

b. Noneconomic losses including physical and mental pain and suffering, emotional distress, inconvenience, loss of enjoyment and impairment of past quality of life.

## COUNT FIFTEEN – MEDICAL MONITORING

297. Plaintiff hereby incorporates by reference each of the preceding paragraphs as if fully set forth herein.

298. At all relevant times, Defendants designed, developed, managed, operated, inspected, tested (or not), marketed, advertised, promoted, disseminated, made publicly available, and/or benefited from the Products and therefore, owed a duty of reasonable care to avoid causing harm to those who used the Products, including Plaintiff.

299. Defendants knew or should have known through the exercise of reasonable care, the risks to consumers posed by the Products.

300. Defendants knew or, by the exercise of reasonable care, should have known use of the Products was harmful and the potential to increase the risks of cancerous growths in premenopausal women, including, but not limited to, the uterus, thereby substantially increasing the risk of cancer, including, but not limited to, uterine cancer, renders the Products unreasonably dangerous when used in the manner it was intended and to an extent beyond that would be contemplated by the ordinary consumer.

301. Defendants owed a duty to the users of the Products, including Plaintiff, to exercise reasonable care in conducting their business to properly and reasonably design, research, develop, manufacture, produce, process, assemble, inspect, supply, distribute, deliver, broker, market, warn, maintain, repair, modify, recall, retrofit, engineer, test, recommend, advertise, and/or make available the Products.

63

302.     Defendants also owed a continuing duty to Plaintiff to remove, recall, or retrofit the unsafe and/or defective platforms across the United States (including in Plaintiff's state).

303.     As a direct and proximate result of Defendants' conduct, Plaintiff has developed significant mental and physical health issues that will require life-long monitoring treatment.

304.     As a direct and proximate result of Defendants' conduct, Plaintiff has a significantly increased risk of developing a serious latent disease and/or injury, suffering further injury at an unknown date in the future, and potentially leading to death.

305.     Monitoring procedures exist that make the early detection and prevention of the above EDC-related and/or induced diseases and mental health issues possible. Many of the above physical and mental issues can lead to other physical and mental health injuries long-term that can be detected and prevented by existing medical and physiological testing and treatment.

306.     These procedures are different from those normally recommended in the absence of exposure. These procedures include non-routine surveillance studies, laboratory testing, and physical examinations, and would be reasonably necessary according to contemporary scientific principles.

307.     The injuries Defendants' Products cause on the human body have already been inflicted on its users, such as Plaintiff, but the full extent of the injury will not manifest until later in Plaintiff's life. Thus, because of Defendants' conduct, it is reasonably necessary that Plaintiff be placed under periodic screening and/or diagnostic testing beyond that normally recommended in the absence of the injuries Plaintiff has suffered as a result of use of these Products.

308.     Plaintiffs demands judgement against Defendants for medical monitoring damages to diagnose the future potential injuries at an earlier date to allow for timely treatment and

prevention of exacerbation of injuries, together with interest, cost of suit, attorney's fees, and all other such relief as the Court deems proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants on each of the above referenced claims and causes of action, as follows:

a.    Awarding compensatory damages in excess of $75,000, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial of this action;

b.    Awarding economic damages in the form of medical expenses, out of pocket expenses, lost earnings, and any and all other economic damages in an amount to be determined at trial of this action;

c.    Punitive and/or exemplary damages for the wanton, willful, fraudulent, reckless acts of the Defendants who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and the Plaintiff in an amount sufficient to punish Defendants and deter future similar conduct.

d.    Prejudgment interest;

e.    Post-judgment interest;

f.    Plaintiff's reasonable attorneys' fees;

g.    Plaintiff's costs of these proceedings; and

h.    Such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all Counts and as to all issues and allegations presented herein.

On the 24th day of February, 2023.

Respectfully submitted,

/s/ *Antonio M. Romanucci*

Antonio M. Romanucci (Bar No. 6190290)
David A. Neiman (Bar No. 6300412)
ROMANUCCI & BLANDIN, LLC
321 North Clark Street, #900
Chicago, Illinois 60654
Phone: (312) 253-8600
Fax: (312) 458-1004
Email: dneiman@rblaw.net
Email: aromanucci@rblaw.net


Navan Ward, Jr. (*pro hac vice* application forthcoming)
Aigner Kolom (*pro hac vice* application forthcoming)
BEASLEY, ALLEN, CROW, METHVIN,
PORTIS & MILES, P.C.
2839 Paces Ferry Road SE, Suite 400
Atlanta, Georgia 30339
Phone: (800) 898-2034
Facsimile: (334) 954-7555
Email: navan.ward@beasleyallen.com
Email: aigner.kolom@beasleyallen.com

***Attorneys for Plaintiff***